**JUDGE HARJANI**

**FILED**
3/3/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

AUSA Patrick King, (312) 353-5341

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**21 M 125**

In the Matter of the Seizure of:

A 2016 Lamborghini Huracan bearing VIN: ZHWUC2ZF1GLA04413 (Subject Vehicle 1);
A 2020 Land Rover Range Rover Evoque bearing VIN: SALZP2FX7LH006525 (Subject Vehicle 2);
A 2017 Porsche 911 Carrera bearing VIN: WP0AB2A9XHS123487 (Subject Vehicle 3);
A 2017 Maserati Ghibli bearing VIN: ZAM57RTA1H1230190 (Subject Vehicle 4)

Case Number:

## APPLICATION AND AFFIDAVIT FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Scot Gill, a Special Agent with the Federal Bureau of Investigation, request seizure warrants and state under penalty of perjury that I have reason to believe that the property described below in the Northern District of Illinois is subject to forfeiture to the United States of America under Title 18, United States Code, Section 981(a)(1)(C), (a)(1)(D), and (b)(3):

The vehicles described in the caption of this application.

Which property was derived in violation of Title 18, United States Code, Sections 1014 (False Statements to a Financial Institution) and 1343 (Wire Fraud).

The application is based on these facts:

See Attached Affidavit,

Continued on the attached sheets and made a part hereof.

_____
Signature of Affiant
SCOT GILL
Special Agent
Federal Bureau of Investigation

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date and time issued: March 3, 2021   4:24 p.m.

_____
Judge's signature

City and State: Chicago, Illinois

Sunil R. Harjani, U.S. Magistrate Judge
Printed name and title

UNITED STATES DISTRICT COURT )
)
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Scot Gill, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately 2011. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to white collar crime, including mail, wire, and bank fraud. I have participated in the execution of multiple federal search and seizure warrants.

This affidavit is submitted in support of an application for warrants to seize:

    a) A 2016 Lamborghini Huracan bearing VIN: ZHWUC2ZF1GLA04413 (**Subject Vehicle 1**);

    b) A 2020 Land Rover Range Rover Evoque bearing VIN: SALZP2FX7LH006525 (**Subject Vehicle 2**);

    c) A 2017 Porsche 911 Carrera bearing VIN: WP0AB2A9XHS123487 (**Subject Vehicle 3**); and

    d) A 2017 Maserati Ghibli bearing VIN: ZAM57RTA1H1230190 (**Subject Vehicle 4**).

(collectively, the **Subject Vehicles**).

2. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel, from persons with knowledge regarding relevant facts, and my training and experience as an FBI Special Agent.

3. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of an application for a seizure warrant, it does not include all the facts that I have learned during the course of this investigation but sets forth only the facts that I believe are sufficient to establish probable cause to believe that the **Subject Vehicles** are property that are derived from proceeds traceable to violations of Title 18 United States Code, Sections 1343 and 1014 (the "**Subject Offenses**").

4. As set forth below, there is probable cause to believe that the **Subject Vehicles** constitute and are derived from proceeds traceable to violations of the **Subject Offenses**, and are therefore subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(C), (a)(1)(D), and 984.

## Legal Authority for Seizure and Forfeiture

5. Title 18, United States Code, Section 981(a)(1) and (b)(3) authorize civil forfeiture of property, real or personal, which constitutes or is derived from proceeds traceable to a violation of, among other offenses, Title 18, United States Code, Sections 1343 (wire fraud) and Section 1014 (false statements on federal loan application) and to issue a seizure warrant in any district in which an act or omission giving rise to the forfeiture occurred.

6. Title 28, United States Code, Section 2461(c) provides that if a person is charged and convicted in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, a court shall order as

part of the defendant's sentence, the forfeiture of any such property that is authorized by the violation for which the defendant was convicted and notice of intent to seek forfeiture was provided by the government.

## Background and Facts Supporting Seizure

10. As explained further below, the government is investigating alleged fraud by FRANCESCO DISTEFANO and has identified evidence that he (a) obtained government-insured loan(s) totaling $357,815 in the name of his business Distefano Enterprises LLC by providing fictitious payroll documents and inaccurate information which resulted in $357,815 being deposited into a bank account he maintained in the name Distefano Enterprises LLC at U.S. Bank (the Subject Account); and (b) received into the Subject Account approximately $1,204,320, that constituted proceeds of government-insured bank loans that were obtained fraudulently by entities known as West Coast POS ("West Coast") and National POS ("National"), where these entities had obtained loans by providing similar fictitious payroll documents. Thereafter, DISTEFANO used proceeds of these loans from the Subject Account to acquire the **Subject Vehicles**.

### *The Paycheck Protection Program*

11. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the

CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program called the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $320 billion in additional funding for PPP loans.

12. In order to obtain a PPP loan, a business must submit a PPP loan application, which requires the business (through its authorized representative) to make certain affirmative certifications regarding its eligibility. In the application, the small business's authorized representative must also provide, among other things, the business's average monthly payroll expenses and number of employees for a certain period preceding the loan. These figures were used to calculate the business's eligibility and the amount of money it may receive under the PPP. In addition, applicants must provide documentation showing their payroll expenses.

13. A PPP loan application must be processed by a participating financial institution (the lender). If a PPP loan application is approved, the lender funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA"). Lenders require that the information in the PPP loan applications be truthful, including information about the applicant business's employees and payroll expenses, which is material to the lender's approval and the terms of the PPP loans.

14. Data from the application including the information about the borrower, amount of the loan, and listed number of employees is transmitted by the lender to the SBA in the course of processing the loan.

15. PPP loan proceeds were required to be used by the business for certain permissible expenses-payroll costs, lease and mortgage interest, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven by the SBA if the business spent the loan proceeds on these items within a designated period of time and used at least 60 percent of the PPP loan for payroll expenses.

### *Economic Injury Disaster Loans (EIDL)*

16. Another source of relief provided by the CARES Act was the expansion of the Economic Injury Disaster Loan ("EIDL") Program, which provided loan assistance (including advances of up to $10,000) for businesses with 500 or fewer employees and other eligible entities for loans up to $150,000. The EIDL Program was designed to provide economic relief to small businesses that are experiencing a temporary loss of revenue.

17. According to documents on the SBA's website, EIDL is a 30 year term direct loan program that provides up to six months of working capital for small businesses to meet financial obligations and operating expenses that could have been met had the COVID-19 disaster not occurred. Unlike the SBA's Paycheck Protection Program loans, EIDL program loans are not forgivable and must be repaid by the borrower. According to the terms of the program, EIDL proceeds can be used to cover

a wide array of working capital and normal operating expenses, such as continuation of health care benefits, rent, utilities, and fixed debt payments. Recipients of EIDL funds are required to retain receipts and contracts for all loan funds spent for three years.

18. To gain access to funds through the EIDL Program, small businesses applied through the SBA via an online portal and application. As part of the EIDL application process, the SBA required applicants to submit truthful information concerning the business and the business owner, including information as to the gross revenues and the cost of goods sold for the business during the twelve (12) months prior to January 31, 2020. Applicants were required to electronically certify that the information provided was accurate and were warned that any false statement or misrepresentation to the SBA may result in sanctions, including criminal penalties.

19. EIDL funds were issued to the small business applicants directly from the United States Treasury.

20. The EIDL Advance was a grant program offered together with the EIDL program. The amount of the advance issued to the small business applicant was determined by the number of employees indicated on the EIDL application, $1,000 per employee, up to $10,000.

*FRANCESCO DISTEFANO and Distefano Enterprises LLC*

21. FRANCESCO DISTEFANO is a resident of Addison, Illinois.

22. According to records maintained by the Montana Secretary of State, Distefano is President of Distefano Enterprises LLC, a limited liability company registered in Kalispell, Montana.

*The Distefano Enterprises PPP Loan*

23. In approximately May of 2020, DISTEFANO applied for a Payroll Protection Program ("PPP") loan on behalf of Distefano Enterprises from U.S. Bank. The PPP loan proceeds were deposited into the Subject Account, for which DISTEFANO is the sole signatory.

24. In the loan application, DISTEFANO stated that, Distefano Enterprises had an average monthly payroll of $79,166 and had 14 employees. The application further represents that Distefano Enterprises requested the PPP loan for the purpose of paying its payroll costs, lease/mortgage interest payments, and utilities. Specifically, the application represents that Distefano Enterprises applied for a PPP loan of $197,915, which was 2.5 times the purported average monthly payroll cost of $79,166.

25. In support of this application, DISTEFANO submitted supporting documentation by email to U.S. Bank employees, including a U.S. Bank employee located in Tennessee. The emails included what purported to be ADP payroll summary reports for 2019 and a list of 9 employees for February 2020.

26. Based upon the representations in the application, on or about May 13, 2020, U.S. Bank disbursed a PPP loan totaling $197,915 into the Subject Account.

27. According to payroll processing firm ADP, the "Payroll Run Report, Summary Reports" documents that DISTEFANO submitted in support of the PPP loan application to U.S. Bank are fictitious. According to ADP, Distefano Enterprises was not an ADP client.

28. According to the Montana Department of Labor & Industry (MDLI) and the Illinois Department of Employment Security (IDES), neither agency had any record of any wages paid by Distefano Enterprises during 2019 or 2020.[1] IDES reported that DISTEFANO applied for and received personal unemployment benefits between March 2020 and continuing into 2021.

*The Distefano Enterprises EIDL & EIDL Advance*

29. In March 2020, DISTEFANO, in his capacity as authorized representative of Distefano Enterprises, applied for an EIDL from the SBA. The application identified DISTEFANO as the 100% owner of the company. The application further listed DISTEFANO's SSN, the company's EIN, an address for DISTEFANO on Oak Mill St in Addison, Illinois ("the DISTEFANO address"), and DISTEFANO's email address (francesco@distefanoenterprisesllc.com).[2] The

---

[1] The Montana Department of Labor & Industry is the Montana state agency that runs Montana's employment services and administers state unemployment benefits. The Illinois Department of Employment Security is the Illinois state agency that operates employment services and administers state unemployment benefits. Based on information supplied by MDLI and IDES, both agencies require employers to report employment and wages to these agencies on a quarterly basis.

[2] DISTEFANO also used the DISTEFANO address on his Illinois driver's license.

application was submitted electronically through the SBA portal from IP address 73.74.247.202.

30. Comcast records show that the IP address 73.74.247.202 ("Addison IP") was registered to the DISTEFANO address that DISTEFANO used on his EIDL application.

31. The EIDL application represented that Distefano Enterprises had 12 employees as of January 31, 2020; gross revenues of $2,500,000; and cost of goods sold of $2,120,000 for the 12 months prior to the date of the disaster. The application requested an advance on the EIDL.

32. As a result of these representations, on June 10, 2020, the SBA disbursed EIDL funds of $149,900 into the Subject Account, and on June 18, 2020, the SBA disbursed an additional $10,000 EIDL advance grant to the Subject Account.

33. As detailed in paragraph 28 above, the MDLI and the IDES both reported that they had no record of any wages paid by Distefano Enterprises during 2019.

34. A review of records from the Subject Account for 2019 did not show deposits consistent with the $2,500,000 he claimed as business revenue and the $2,120,000 as costs of goods sold in the EIDL application, but rather, showed total credits in his business account of $716,911 and total debits of $722,593.

## *West Coast POS and National POS Loans*

35. The investigation further revealed that the Subject Account also received approximately at least $1,204,320 of proceeds from fraudulent PPP loans obtained by entities known as West Coast POS ("West Coast") and National POS ("National").

36. On approximately July 17, 2020, Sargis Urumieh, as President of West Coast, applied for a PPP loan in the amount of $1,090,891 from Arkansas Capital Corporation. On approximately July 22, 2020, this loan was funded by Arkansas Capital and Encore Bank.

37. In the West Coast application, Urumieh represented that the business had 67 employees and an average monthly payroll of $436,356.37. In support of this application, on July 20, 2020, Urumieh emailed Arkansas Capital what purported to be an ADP payroll run report listing total payroll payments of $5,236,276 for 2019, as well as what purported to be an IRS Form 940 signed by "HA Healy" an employee of ADP showing total payments to all employees of $5,236,276 for 2019.

38. Based upon these false representations, on approximately July 22, 2020, Encore Bank disbursed a PPP loan totaling $1,090,890 into a bank account West Coast maintained at Encore Bank and that was opened to receive the PPP loan proceeds. ("West Coast account").

39. According to ADP, the payroll run report provided in support of the PPP application is fictitious, and that neither West Coast nor Urumieh were ADP clients

until approximately July 23, 2020 (after the date of the loan application). ADP reported that in connection with West Coast's retention of ADP to process payroll for that entity, ADP received a "reporting agent authorization form" on behalf of West Coast. That form was e-signed in the name of Urumieh and was completed and signed from the Addison IP address associated with DISTEFANO.

40. From approximately July 2020 through January 2021, approximately $389,539 was transferred from the West Coast account to the Subject Account or to ADP, who, at the direction of West Coast, subsequently transferred funds to the Subject Account. ADP reported that prior to the transfer, West Coast identified DISTEFANO as a 1099 employee or contractor of West Coast.

41. On approximately July 25, 2020, Urumieh, as President of National, applied for a PPP loan in the amount of $1,722,645.51 from Arkansas Capital Corp. On approximately July 27, 2020, this loan was funded by Arkansas Capital and Encore Bank.

42. In the application, Urumieh claimed that he had 123 employees and an average monthly payroll of $689,058.20. In support of that application on July 26, 2020, Urumieh sent an email to Arkansas Capital, with a "cc" sent to DISTEFANO. Attached to the email was what purported to be an ADP Payroll Summary Report for 2019 that showed total employee wages of approximately $8,272,698.45 and what purported to be an IRS Form 941 for the first quarter of 2020.

43. On approximately July 27, 2020, Urumieh sent an email to Arkansas Capital, with a "cc" sent to DISTEFANO, which contained a purported IRS Form 940 for tax year 2019 reporting wages of $8,269,698.45.

44. According to ADP, the Payroll Summary Report is fictitious. In addition, according to ADP, National was not an ADP client until approximately July 28, 2020. ADP reported that they received a "reporting agent authorization form" on behalf of National that was e-signed in the name of Urumieh but completed and signed from the Addison IP.

45. Based upon these false statements, on July 29, 2020, Encore Bank deposited $1,722,645.50 of PPP loan proceeds into National's account at Encore Bank.

46. From approximately July 2020, through January 2021, approximately $814,780 was transferred from the National account to the Subject Account or to ADP, who, at the direction of National, subsequently transferred funds to the Subject Account. ADP reported that prior to the transfer, National identified DISTEFANO as a 1099 employee or contractor of West Coast

47. There were no other sources of funds into the West Coast and National accounts at Encore Bank other than the funds received as proceeds of the PPP loans. In total, approximately $1,204,320 of funds from the West Coast and National accounts at Encore were transferred directly to the Subject Account or to ADP payroll accounts at ADP and subsequently transferred to the Subject Account.

### *Subject Vehicle 1 / 2016 Lamborghini Huracan*

48. Records from Bentley Gold Coast, an auto dealer located in Chicago, show that on July 30, 2020, DISTEFANO purchased a 2016 Lamborghini Huracan bearing VIN: ZHWUC2ZF1GLA04413 (Subject Vehicle 1) for $195,445. DISTEFANO paid for the vehicle by charging a total of $100,000 to an AMEX credit card, and with a cashier's check dated approximately July 31, 2020, in the amount of $95,445 from the Subject Account to Gold Exotic Import LLC.[3] A review of bank records showed that on July 31, 2020 the Subject Account received $388,368.73 in PPP loan proceeds from the National POS bank account and approximately $3,173.07 in PPP loan proceeds from the West Coast POS account. More specifically, PPP loan proceeds held in the National POS account were initially transferred in a payroll payment from the National POS account to ADP on approximately July 29, 2020, and thereafter transferred from ADP to the Subject Account. On the same day that DISTEFANO's Subject Account received these proceeds (that National and West Coast obtained by fraud as described above) DISTEFANO transferred the $95,445 payment to the dealership and $105,000 to AMEX to pay for charges on the same credit card he used to pay for **Subject Vehicle 1.**

---

[3] Bentley Gold Coast and Gold Coast Exotic Imports LLC are part of a collection of assumed names managed by the Joe Perillo Dealer Group according to their website and Illinois Secretary of State business records.

### *Subject Vehicle 2 / 2020 Land Rover Range Rover Evoque*

49. Land Rover of Hinsdale records reveal that on approximately September 9, 2019, DISTEFANO purchased a 2020 Land Rover Range Rover Evoque bearing VIN: SALZP2FX7LH006525 (**Subject Vehicle 2**) for approximately $55,034. Bank records show that on approximately July 31, 2020, DISTEFANO obtained a cashier's check payable to Chase Auto for loan #11925214214400 for a payoff of **Subject Vehicle 2** in the amount of $46,509.39 with funds from the Subject Account. As set forth above, the Subject Account received loan proceeds obtained fraudulently by National and West Coast around July 31, 2020.

### *Subject Vehicle 3 / 2017 Porsche 911 Carrera*

50. Records from Napleton Westmont Porsche reveal that on August 6, 2020, DISTEFANO purchased a 2017 Porsche 911 Carrera bearing VIN: WP0AB2A9XHS123487 (**Subject Vehicle 3**) for $94,345. Distefano paid for **Subject Vehicle 3** with an AMEX credit card charge of $5,000 and with business check #1212 in the amount of $89,345, drawn on the Subject Account. On August 6, 2020, – the day of the purchase – $95,000 of PPP loan proceeds were transferred from the National POS account at Encore Bank to the Subject Account. The following day, on August 7, 2020, the Subject Account received $3,673.07 in PPP loan proceeds from West Coast POS; and $3,665.38 in PPP loan proceeds from National POS.[4]

---

[4] On August 7, 2020, the Subject Account also received unemployment payments from the Illinois Department of Employment Security.

### *Subject Vehicle 4 / 2017 Maserati Ghibli*

51. Illinois Secretary of State records reveal that on approximately March 23, 2017, DISTEFANO leased a 2017 Maserati Ghibli bearing VIN: ZAM57RTA1H1230190 (**Subject Vehicle 4**), in which JP Morgan Chase Bank acted as the Lessor and DISTEFANO as the lessee. JP Morgan bank records show that on approximately July 31, 2020, DISTEFANO obtained a cashier's check payable to Chase Auto, number 11352484, in the amount of $41,250.94, using funds from the Subject Account, to purchase **Subject Vehicle 4**.

### *Bank Transactions and the Subject Vehicles*

52. The Subject Account was a U.S. Bank account with an account number ending in XXXXX9624 held in the name of "Francesco Distefano dba Distefano Enterprises" with Distefano as the sole signatory. After the receipt of fraudulently obtained PPP and EIDL loan proceeds, Distefano used funds from the Subject Account to purchase the **Subject Vehicles**. Absent the transfer of fraudulently obtained funds, Distefano would have had insufficient funds to purchase the **Subject Vehicles**.

53. More specifically, on July 31, Distefano used approximately $283,205 from this account to acquire **Subject Vehicles 1, 2, and 4**. On July 31, 2020, the ending balance in the Subject Account was approximately $409,801, of which $357,815 constituted fraudulently obtained EIDL and PPP loan proceeds directly issued to Distefano Enterprises in May and June 2020, as set forth in more detail

above. The account balance on July 31 absent the fraud proceeds was approximately $51,986. On July 31, the Subject Account received approximately of the $391,994 of PPP funds fraudulently obtained by National POS and West Coast POS as described more fully above.[5] Absent the proceeds of the fraud, Distefano would have had insufficient funds to purchase these vehicles.

54. On August 6, 2020, Distefano used $94,345 from the Subject Account to purchase **Subject Vehicle 3**. On the same day the Subject Account received a wire transfer of $95,000, which were PPP funds fraudulently obtained by National POS. On August 3, 2020, the beginning balance in the Subject Account was approximately $409,801, of which $357,815 constituted fraudulently obtained EIDL and PPP loan proceeds directly issued to Distefano Enterprises in May and June 2020, as set forth in more detail above. The account balance on August 3 absent the fraud proceeds and prior to the transfer of $95,000 in PPP funds from National POS was approximately $51,986. From August 3 through August 6 the defendant also had other non-vehicle related deposits and expenditures resulting in an approximate balance of $47,968. Absent the proceeds of the fraud, Distefano would have had insufficient funds to purchase **Subject Vehicle 3**.

55. Based upon the facts set forth above, there is probable cause to believe that the **Subject Vehicles** constitute proceeds of wire fraud in violation of 18 U.S.C.

---

[5] On July 31, the Subject Account received $388,821.23 in PPP funds fraudulently obtained by National POS and $3,173 from West Coast POS as set forth above.

§ 1343, or property traceable to such proceeds, and are therefore subject to seizure an forfeiture to the United States pursuant to 8 USC 981(a)(1)(C) and 28 U.S.C. § 2461(c).

Accordingly, I respectfully request that the court issue seizure warrants pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(C), authorizing the seizure of the **Subject Vehicles**.

## CONCLUSION

56. Based on the above information, I respectfully submit that the **Subject Vehicles** are subject to seizure because they represent (1) property, real or personal, which constitutes or is derived from proceeds traceable to the **Subject Offenses**, and (2) property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from the **Subject Offenses**. I therefore respectfully request that this Court issue a seizure warrant for the **Subject Vehicles**.

FURTHER AFFIANT SAYETH NOT.

_____
Scot Gill
Special Agent
Federal Bureau of Investigation

Sworn to and affirmed by telephone this 3rd~~th~~ day of March, 2021

_____
Honorable Sunil R. Harjani
United States Magistrate Judge